**Judy A. WARD, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 98–4108–DES.**

United States District Court, D. Kansas.

Sept. 30, 1999.

Mitchell D. Wulfekoetter, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Judy Ward, plaintiff.

D. Brad Bailey, Office of United States Attorney, Topeka, KS, for Social Security, Commissioner of, Kenneth S. Apfel, defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on plaintiff's request seeking reversal of the Social Security Commissioner's denial of disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* The court has reviewed the administrative record and the briefs of both parties. For the following reasons, the plaintiff's request is granted.

## I. PROCEDURAL BACKGROUND

On July 31, 1995, plaintiff filed an application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* Her application was initially denied and was denied again on reconsideration. Plaintiff requested an administrative hearing. On October 25, 1996, the administrative law judge ("ALJ") rendered a decision in which he found that Ms. Ward was not under a "disability" as defined in the Act.

Ms. Ward requested a review of that decision by the Appeals Council, and she submitted additional medical evidence to the Appeals Council, which was made part of the record. On April 30, 1998, the Appeals Council denied the plaintiff's request for review. The ALJ's decision is the final decision of the Commissioner.

## II. FACTUAL BACKGROUND

Ms. Ward was born on June 14, 1951. She obtained a GED in 1985. At the time of the hearing, she was married to Matthew Ward, who recently died of terminal cancer. From July 1981 through October 1988, plaintiff worked as a billing clerk for the Mental Health Center of East Central Kansas. Plaintiff then worked as an office assistant for the State of Kansas Alcohol Beverage Control from October 1988 through July 1995. She has not worked since July 1995, due to chronic pain and fatigue.

On October 26, 1993, plaintiff was injured at work when a large metal file cabinet fell on her. She went to the

emergency room ("ER") the next day with neck pain. Plaintiff was given temporary restrictions and began physical therapy. On November 8, 1993, she returned to the ER where Dr. Catherine M. O'Keefe diagnosed myofascial pain syndrome, and referred the plaintiff to Dr. Sharon McKinney who was authorized to treat the plaintiff under the Kansas worker's compensation system.

On November 10, 1993, plaintiff began seeing Dr. McKinney, who continues to be her treating physician. Her original diagnosis was myoligamentous strain and treatment included physical therapy. On November 16, 1993, Dr. McKinney noted numerous trigger points along the left scapula, and muscle tension in the supraspinatus, rhomboids, and trapezius muscles. Plaintiff continued physical therapy and was released to work four hours a day. By December 29, 1993, plaintiff still suffered from trigger points and headaches, but had returned to work full-time "with rests." From this point, the plaintiff's condition slowly and steadily declined.

By June 2, 1994, plaintiff had significant trigger points, and increased discomfort due to headaches and her shoulders and back. Plaintiff restarted physical therapy, and took medication for sleeping problems. On June 10, 1994, she began to see Dr. Douglas Sheafor, a psychiatrist, for depression. He diagnosed major depression reactive to her chronic pain and limitations the injury placed on her life. Her symptoms included fatigue, crying spells, depression, restless sleep, loss of interest and enjoyment of life. He prescribed antidepressant medication.

On August 22, 1994, Dr. McKinney noted new symptoms of cramping and pain in the upper arms bilaterally. The trigger points were very tender. Plaintiff continued to work full-time, but had missed several days of work from November 29, 1994, through December 11, 1994, due to increased pain, and an inability to get out of bed. Dr. McKinney noted new trigger points in the left shoulder and cervical spine muscles and in the area of the left SI joint and greater trochanter. Plaintiff began taking Hydrocodone for pain and restarted physical therapy.

On December 13, 1994, Dr. McKinney diagnosed fibromyalgia. Fibromyalgia has been described as:

> [A] common, but elusive and mysterious disease, much like chronic fatigue syndrom, with which it shares a number of features.... Its cause or causes are unknown, there is no cure, and of greatest importance to disability law, its symptoms are entirely subjective.... The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996). The plaintiff has fourteen of the eighteen tender spots. Dr. McKinney recommended continued physical therapy, more Hydrocodone, a lumbosacral corset, and a comfortable chair at work so plaintiff could rest on her breaks.

Plaintiff continued to work full-time for the next six months, but had significant absences due to her illness. Increased disabling headaches and "hot" trigger points prevented the plaintiff from working. On June 19, 1995, Dr. McKinney restricted plaintiff to a four-hour work day, with breaks allowing plaintiff to walk around every forty-five minutes. The plaintiff again had significant absences. On July 17, 1995, Dr. McKinney declared the plaintiff unable to work due to disability.

Plaintiff testified that she has "bad days" three to four days out of the week. On bad days, she is unable to do housework, hobbies, shopping, or any other meaningful activity. All she can do on such days is lie down with a heating pad

and rest for an indefinite period of time. She averages two severe headaches a week which impair her ability to concentrate. The plaintiff described her limitations as follows: she could not sit comfortably for more than fifteen minutes, walk three city blocks, lift ten to fifteen pounds, could seldom bend over to touch the floor, had difficulty gripping an object for more than fifteen minutes, and suffered from headaches two days a week which impair her ability to concentrate. (Tr. 13–17).

Both plaintiff's treating physician and psychiatrist agree that plaintiff is disabled and unable to work due to chronic pain and fatigue caused by fibromyalgia. They also agree that plaintiff is not malingering or exaggerating her symptoms. Fibromyalgia is not consistent day to day. Dr. McKinney explained plaintiff's need to rest as follows: "When she is having an average to poor day she is going to require rest breaks with much of any activity. Sometimes she may only need to rest for ten or fifteen minutes when on others she will need to rest for an hour or two. The pain and weakness in these muscles can be overwhelming and certainly causes significant fatigue." (Tr. 307). In addition to disabling headaches, Dr. McKinney described the plaintiff's limitations as follows: limited ability to sit and stand depending on her strength from fifteen minutes to two hours, inability to consistently grip objects, avoid bending, stooping, pushing, and pulling, and ability to lift five to twenty pounds depending on her strength. (Tr. 306–07). Dr. McKinney's assessment of plaintiff's restrictions supports the plaintiff's own description of her limitations.

The only opinion that plaintiff was not disabled was given by Dr. Lynn DeMarco, reviewing physician. Dr. DeMarco agreed that the plaintiff suffered from fibromyalgia, but disputed the method of diagnosis and severity of pain. He testified that fibromyalgia does not cause the excruciating pain described by the plaintiff. (Tr. 501). Dr. DeMarco described the plaintiff's limitations as follows: unlimited ability to sit, ability to stand for two hours at a time, up to four hours out of an eight hour work day, ability to walk for three to four blocks, lift a ten to twenty pound object, carry it for fifteen feet, ten to fifteen times an hour, occasionally bend and climb stairs, and unlimited ability to grip objects. (Tr. 479–480).

Karen Sherwood, vocational expert, testified in response to two hypothetical questions. She testified that if plaintiff had the abilities described by Dr. DeMarco, plaintiff could perform her past relevant work as a computer researcher. (Tr. 516). Ms. Sherwood also testified the plaintiff could not be substantially gainfully employed based on the following hypothetical: need to lie down throughout the week, with fifty percent "bad days" in which plaintiff would need to lie down frequently throughout the day regardless of activity level for fifteen minutes to over an hour. (Tr. 517).

## III. STANDARD OF REVIEW

 Title 42, § 405(g) of the United States Code provides for judicial review of a final decision of the Commissioner of the Social Security Administration (SSA). The reviewing court must determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994). Substantial evidence is adequate, relevant evidence that a reasonable mind might accept to support a conclusion. *Hargis v. Sullivan,* 945 F.2d 1482, 1486 (10th Cir.1991). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994) (citation omitted). "A finding of no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan,* 966 F.2d 1326, 1329 (10th Cir.1992) (citations omitted). The reviewing court must also determine whether the Commissioner applied the correct legal standards. *Washington,* 37 F.3d at 1439. Reversal is appropriate not only

for lack of substantial evidence, but also for cases where the Commissioner uses the wrong legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994). In applying these standards, the court must keep in mind the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965).

## IV. COMMISSIONER'S DECISION

In the ALJ's October 25, 1996, decision, the ALJ made the following findings:

1. Claimant met the special earnings requirements of Title II of the Act on May 1, 1995, the date she stated she became unable to work, and she continues to meet them through the date of this decision.

2. The evidence does not establish that claimant has engaged in "substantial gainful activity" since May 1, 1995.

3. The evidence establishes that claimant has a combination of medically determinable impairments that attains the "severity" threshold. These impairments are summarized as: fibromyalgia; not severe depression; and not severe cervical spondylitis, sufficient to cause occasional discomfort.

4. Claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Part A, Appendix 1, Subpart P, Regulations No. 4. (See Psychiatric Review Technique form attached hereto and incorporated herein by this reference.)

5. Claimant's residual functional capacity subsumes the ability to meet the requirements of work performable within limits including: unrestricted ability to sit; able to stand 2 hours at a time, up to 4 hours in an 8 hour day; able to walk on a level surface unassisted at a normal pace for 3 to 4 city blocks; able to lift 10 to 20 pounds using both hands, and carry such weight 15 feet up to 10 to 15 times per hour; unrestricted gripping and grasping; and able to occasionally bend and climb stairs.

6. Claimant is able to perform her past relevant work as a computer researcher, as a receptionist, or as a billing clerk.

7. Claimant has not been under a "disability" from May 1, 1995, through the date of this decision.

## V. DISCUSSION

██ If the Commissioner finds that a person is able to perform work she has done in the past, she is not disabled. *Reyes v. Bowen,* 845 F.2d 242, 243 (10th Cir.1988). The ALJ's decision that the plaintiff could perform her past relevant work as a computer researcher is not supported by substantial evidence.

██ Courts have recognized that the pain suffered by those diagnosed with fibromyalgia can be disabling. *See Sarchet,* 78 F.3d at 309; *Cline v. Sullivan,* 939 F.2d 560 (8th Cir.1991); *Biri v. Apfel,* 4 F.Supp.2d 1276 (D.Kan.1998). The symptoms of fibromyalgia are entirely subjective, and there are no laboratory tests to identify its presence or severity. *Sarchet,* 78 F.3d at 306. The Commissioner does not dispute that the plaintiff has fibromyalgia. It is disputed whether the plaintiff suffers disabling pain and fatigue as a result of the fibromyalgia. Subjective symptoms must be evaluated with due consideration of credibility, motivation, and medical evidence of impairment. *Dvorak,* 345 F.2d at 897. Other factors the court considers in evaluating whether pain is disabling are attempts to find relief from pain, willingness to try treatment, regular contact with a doctor, and daily activities. *Luna v. Bowen,* 834 F.2d 161, 165–66 (10th Cir.1987).

The ALJ adopted the opinion of Dr. DeMarco that the plaintiff had a typical case of fibromyalgia. Dr. DeMarco testified that the majority of those with fibromyalgia do not experience the excruciating

pain described by the plaintiff. However, Dr. DeMarco, who had never examined the plaintiff, admitted that pain is subjective and the person in the best position to evaluate the effect of pain was the treating physician. In finding the plaintiff had a typical case of fibromyalgia, the ALJ rejected the testimony of the plaintiff, her husband, her treating physician, and her psychiatrist.

■ Proper credibility determinations are essential in cases involving subjective symptoms. The ALJ normally determines the weight and credibility of testimony, and these determinations are generally considered binding on the reviewing court. *Broadbent v. Harris,* 698 F.2d 407, 413 (10th Cir.1983). However, there must be some basis in the record for the ALJ to disbelieve crucial testimony. *Lund v. Weinberger,* 520 F.2d 782, 785–86 (8th Cir. 1975). The record does not support the ALJ's credibility findings. After reviewing the record as a whole, the court finds the ALJ's decision that plaintiff is not disabled is not supported by substantial evidence.

### A. Plaintiff's Testimony

In addition to plaintiff's testimony, the court has also reviewed plaintiff's written descriptions of her daily activities. Neither written nor oral statements regarding her activities and level of pain support a claim that plaintiff could return to her past employment.

■ The ALJ found the plaintiff's testimony not credible, and instead relied on the testimony of the reviewing physician to determine the level of pain of a person with fibromyalgia. The reviewing court may evaluate the ALJ's decision with a skeptical eye where the claimant's subjective complaints of pain are supported by treating physicians, and the ALJ relied on an expert who examined the record but not the plaintiff. *Broadbent,* 698 F.2d at 414. The plaintiff's credibility is supported by the testimony of both her treating physician and her psychiatrist. Both doctors agree that plaintiff is disabled, and

that she is not malingering or exaggerating.

Plaintiff's desire to seek relief from her pain corroborates her complaints. Plaintiff is taking Lortabs, Ambien, Naproxen, Cyclobenzaprine, and Hydrocodone. She uses a theracane to apply pressure to the knots in her back. She has implemented all the doctor's suggestions, including resting at work, getting a new chair, and rearranging files and her computer. Plaintiff speaks with her doctor once a month, and sets up appointments on an as needed basis when her condition changes.

The only evidence to suggest that the plaintiff is not doing all that is medically possible to relieve her pain is plaintiff's forty pound weight gain. The best way to relieve the symptoms of fibromyalgia is to exercise. However, the plaintiff explained that she is unable to do the exercises on bad days because it increases her pain. In response to the suggestion that the plaintiff is not in pain because she does not do the exercises, Dr. McKinney stated, "If a person is not able to be active, they do not burn calories so they gain weight ... I can't believe someone would suggest that gaining weight indicates that a person does not have pain." (Tr. 384). The plaintiff's weight gain supports her complaint of disabling pain.

Plaintiff's consistent work history also supports her credibility. Plaintiff has been successfully employed for almost fifteen years prior to her illness. She made numerous attempts to return to work on a part-time basis. Her treating physician noted that plaintiff had made a very courageous effort to return to work, and wanted to work very badly. (Tr. 308). Her psychiatrist stated that throughout the time he had treated the plaintiff, she wanted to work and frustrated by her inability to do so. (Tr. 377). The plaintiff testified at the hearing that she loved her job, and loved her work. (Tr. 477). The ALJ states that plaintiff's work history is not positive because of reported absences in March 1995. However, the plaintiff was absent due to

her pain. The ALJ also points to a note by the psychiatrist that the plaintiff was angry at her employer and felt she was being set up to be fired. Any employee who misses work due to illness is susceptible to such feelings. The evidence clearly indicates plaintiff desires to work but is unable to do so. There is no evidence to indicate that the plaintiff did not have a positive work history.

Nothing in the record suggests that the plaintiff would be able to return to her past employment. Dr. McKinney and Dr. Shaefor confirm plaintiff's testimony that she is unable to work due to chronic pain and fatigue. In addition, both doctors believe that plaintiff is not malingering or exaggerating her symptoms. Even the ALJ stated, "I won't find your client to be a malingerer because I don't believe that to be the case." (Tr. 498).

To discredit the plaintiff, the ALJ points to slight discrepancies between the testimony of the plaintiff and her husband. The plaintiff testified that an average week consisted of three to four bad days. Mr. Ward testified that plaintiff had an average of three bad days a week. He also testified that the week varies, and the plaintiff sometimes only has one bad day. The plaintiff also testified that on a bad day she has to lie down for about two hours, but that it varies depending on how she is feeling. Mr. Ward testified that there was no set time period. He testified that plaintiff will lie down for ten to fifteen minutes, get up, then lie down again. The plaintiff also testified that she did not watch TV while she lied down. Mr. Ward testified that sometimes the TV was on, but that his wife did not appear to be watching it. The statements of plaintiff and her husband are not inconsistent. These subtle differences should not be the basis to reject plaintiff's testimony given that her pain fluctuates daily.

The ALJ also points out that the plaintiff's testimony is inconsistent with her courtroom behavior. Plaintiff testified that on the day of the hearing she was having a bad day, and that she could sit for ten to fifteen minutes on a bad day. Forty three minutes into the hearing, the ALJ asked her why she had not requested to get up. Plaintiff responded that she had been moving around in her chair, and that she was nervous. The ALJ stated, "So, you can sit on a so-called bad day a hell of a lot longer than fifteen minutes because you've done it." (Tr. 465). Although the ALJ acknowledged that the plaintiff had been moving around in her chair and later said he would not find her to be malingering, he considered this in his credibility determination. The plaintiff had simply estimated how long she could sit in a chair comfortably on an average day. She had not been siting comfortably when the ALJ attacked her on the stand. This was not a proper basis for discrediting plaintiff's testimony.

The ALJ's finding that the plaintiff is not credible is not supported by the record. There are no legitimate reasons to discredit the plaintiff's testimony. There is no suggestion of exaggeration or malingering, and the plaintiff's testimony is supported by her treating physician, psychiatrist, and husband. The ALJ improperly rejected the plaintiff's testimony.

### B. Physician Testimony

 The ALJ rejected the opinion of Dr. McKinney, the plaintiff's treating physician, in favor of Dr. DeMarco, reviewing physician. Dr. McKinney has consistently given her opinion that the plaintiff is disabled. It is well-established that the ALJ must give substantial weight to the testimony of the claimant's treating physician, unless good cause is shown. *Frey v. Bowen*, 816 F.2d 508 (10th Cir.1987). The reports of treating physicians are to be given greater weight than reports of reviewing physicians. *Id.* (quoting *Broadbent*, 698 F.2d at 412). A treating physician's opinion may be rejected "if it is brief, conclusory, and unsupported by medical evidence." *Id.* (quoting *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984)). Before an ALJ can disregard a

treating physician's testimony, he must set forth specific, legitimate reasons. *Id.*

■■■ The ALJ listed the following reasons for discrediting the testimony of Dr. McKinney: (1) Dr. McKinney's method for diagnosing fibromyalgia is incorrect; (2) The plaintiff received a nine percent whole body impairment rating from Dr. McKinney which is inconsistent with a total disability; and (3) Dr. McKinney is a purveyor of opinions. The court finds that the ALJ's reasons for disregarding Dr. McKinney's opinion are not legitimate.

First, the ALJ rejects Dr. McKinney's opinion because he believes her method of diagnosing fibromyalgia was improper. This argument has no relevance in this case.[1] Both Dr. McKinney and Dr. DeMarco agree that the plaintiff has fibromyalgia. They disagree on whether the plaintiff experiences disabling pain. The effect and severity of pain is not dependant on the diagnosis.

Second, the ALJ found Dr. McKinney's nine percent impairment rating inconsistent with a total disability. Dr. McKinney gave the plaintiff an overall nine percent whole person permanent impairment for purposes of plaintiff's workers' compensation claim. Plaintiff received a $15,000 settlement as a result of her claim.[2] The ALJ states:

> On the same date, [Dr. McKinney] issued a prescription pad disability statement ('Can't work, totally disabled'), which, taken in combination with the 9% rating impresses as setting a rather loose, qualitative tone to he subsequent opinions as to the question of claimant's disability as her support of claimant's legal needs moved into that area.... Her conclusion that a person with a 9% whole body impairment is disabled due to the identical impairment does not

suggest a meaningful understanding of the term disability as it is used in the Social Security disability proceedings. (Tr. 22–23). To know whether Dr. McKinney's conclusions are inconsistent, the nature of workers' compensation ratings must be understood.

Kansas doctors use the AMA Guides to rate a permanent impairment for workers' compensation. Dr. McKinney explained how a doctor uses the guidelines to calculate a functional impairment as follows:

> Those guides have the physician consider loss of range of motion of certain body parts and loss of strength, loss of sensation or stability or reflex. The physician measures these and applies them to various charts in the AMA Guide. The charts then dictate what actual percentage of impairment the person should be assigned ... the AMA guides do not allow consideration for pain, fatigue and loss of the ability to concentrate when a person's pain is real bad. Nor does it consider whether the impairment makes one too slow to be gainfully employed or if the impairment causes a sleep disorder and incapacitating fatigue. Impairment of function is simply a gauging of the loss of use or the loss of function of a particular body area pursuant to these charts.

(Tr. 380–81). A person can be totally disabled from pain, but receive a low impairment rating because of the criteria used in the AMA Guides' calculations. Therefore, there is no inconsistency in the two ratings.

Finally, the ALJ found that Dr. McKinney is a purveyor of opinions. The ALJ qualified his statement with the following footnote:

---

1. The record is unclear as to whether Dr. McKinney actually used an incorrect method to diagnose fibromyalgia. Dr. DeMarco used the term "tender points" rather than the term "trigger points" used by Dr. McKinney. Whether this is merely a semantic argument or whether there are legitimate differences is irrelevant to the decision in this case.

2. The $15,000 settlement is not a reflection of the validity of plaintiff's claim. One of the factors contributing to the settlement was lack of causation. Because fibromyalgia has no known cause, it would be difficult to prove that plaintiff's illness was the result of a work-related injury.

The same thing essentially might be said of Dr. DeMarco in his capacity as a medical expert. A possible difference, however, is that the premise underlying Dr. DeMarco's role as a medical expert is that he is paid by the government to review the documentary medical evidence, and to be prepared to explain it an give a nonadversarial, objective professional opinion as to what it shows ... it is of absolutely no consequence to the undersigned, or to the future of Dr. DeMarco's relationship with the SSA, whether he testifies that the normal implication of the recorded medical findings is the inability to lift a finger, or the ability to play fullback for the Bears. It is doubtful that many of those who pay Dr. McKinney for her opinion in a Worker's Compensation or disability case could say the same thing, and equally doubtful that she is unaware of this.

(Tr. 19). Simply put, the ALJ believes Dr. DeMarco is more credible because he is paid by the government to be objective and nonadversarial. This position is inconsistent with current case law. The reports of treating physicians "are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim." *Frey*, 816 at 508 (quoting *Broadbent*, 698 F.2d at 412). The ALJ's statement does nothing more than accuse Dr. McKinney of giving a biased opinion.

There is nothing in the evidence to suggest Dr. McKinney's opinion is not objective. There is also nothing to suggest that Dr. McKinney has a reputation for giving biased opinions. She has never testified before ALJ Lowe. Dr. McKinney frequently performs consultative exams as an expert for the Social Security Administration ("SSA"), placing her in Dr. DeMarco's role. The SSA itself trusts her to give an objective opinion. The state also selected Dr. McKinney to treat the plaintiff for purposes of workers' compensation, trusting her to give an unbiased opinion. Without evidence of bias, it was improper for

the ALJ to disregard Dr. McKinney's opinion on that basis.

There are no legitimate reasons set forth to support the ALJ's finding that Dr. McKinney was not credible. Absent specific legitimate reasons, the ALJ must give more weight to the treating physician's opinion than that of the reviewing physician. The ALJ did not properly consider Dr. McKinney's opinion which clearly supports the plaintiff's disability claim.

██ In addition, the ALJ improperly dismissed the opinion of Dr. Shaefor, the treating psychiatrist, as irrelevant. It is true that Dr. Shaefor is not in the position to testify as to whether fibromyalgia causes the pain described by plaintiff. However, he is in the best position to testify as to whether the plaintiff's pain is real or whether she is "making things up." Dr. Sheafor stated the plaintiff was not malingering and she wanted to work. (Tr. 377). He also stated the plaintiff was "seriously limited by the chronic pain of her fibromyalgia." (Tr. 377).

## VI. CONCLUSION

For the reasons stated above, the court finds that substantial evidence does not support the ability of the plaintiff to return to her former work. A review of the record as a whole supports the conclusion that the plaintiff was disabled and unable to work as of May 1, 1995. Therefore, the decision of the ALJ is reversed. Because the work was sedentary, it is appropriate to remand this case for an award of benefits. *Sisco v. U.S. Department of Health and Human Services*, 10 F.3d 739, 745–46 (10th cir.1993).

**IT IS THEREFORE BY THE COURT ORDERED** that plaintiff's request is granted. The ALJ's decision is reversed and remanded to the Commissioner for an immediate award of benefits consistent with this order.