Freda M. PRIEST, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 03–4008–SAC.

United States District Court,
D. Kansas.

Jan. 14, 2004.

**1206**

Steven M. Tilton, Tilton & Tilton, LLP, Topeka, KS, for Plaintiff.

David D. Plinsky, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the claimant Freda Priest's applications for disability insurance benefits under Title II of the Social Security Act ("Act") and for supplemental security income ("SSI") under Title XVI of the Act. The record from the proceedings below has been filed, and both parties have timely filed their respective briefs pursuant to D.Kan. Rule 83.7(d). The case is ripe for decision.

## PROCEDURAL HISTORY

Claimant applied for disability benefits and SSI in February and March of 2001, asserting she was disabled on May 15, 2000. Her claims were denied initially and on reconsideration. At the claimant's request, a hearing before an administrative law judge ("ALJ") was held on March 19, 2002, and she appeared in person and with counsel. (Tr. 234–262). Witnesses at the hearing were the claimant, a vocational expert, and the claimant's husband. The ALJ subsequently issued his decision on May 1, 2002, finding that the claimant was not disabled as defined under the Social Security Act. The Appeals Council denied the claimant's request for review after considering the claimant's memorandum and additional evidence. Thus, the ALJ's decision stands as the commissioner's final decision. *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994).

## STANDARD OF REVIEW

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "more than a mere scintilla" and is that evidence which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotation and citation omitted). "A finding of no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary

medical evidence." *Trimiar v. Sullivan,* 966 F.2d 1326, 1328 (10th Cir.1992) (quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d at 858 (citation omitted).

The court's duty to assess whether substantial evidence exists:

"is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.' "

 *Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler,* 760 F.2d 1052, 1055 (10th Cir. 1985)). The court "must examine the record closely to determine whether substantial evidence supports" the commissioner's determination. *Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir.1996). The court is not to reweigh the evidence or substitute its judgment for the commissioner's. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994). The court typically defers to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). Nonetheless, " '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence ....' " *Winfrey,* 92 F.3d at 1020 (quoting *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988)). The courts do not mechanically accept the commissioner's findings. *Claassen v. Heckler,* 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services,* 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the" commissioner. (citation omitted)). Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the commissioner's conclusions are rational. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985). " 'We examine the record as a whole, including whatever in the record fairly detracts from the weight of the ... [commissioner's] decision and, on that basis determine if the substantiality of the evidence test has been met.' " *Glenn v. Shalala,* 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800–01 (10th Cir. 1991)); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Tenth Circuit has said that "[t]he record must demonstrate that the ALJ considered all of the evidence," and the ALJ must "discuss[ ] the evidence supporting his decision, ... the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects." *Clifton v. Chater,* 79 F.3d 1007, 1009–1010 (10th Cir.1996). The ALJ, however, is not required to discuss every piece of evidence. *Id.*

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan,* 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A).

 A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant bears his burden of proof on the

first four steps, he establishes a prima facie case of disability. *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir.1988). The burden of proof then shifts to the commissioner at step five to show that the claimant retains the residual functional capacity ("RFC") to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir.1989). The commissioner satisfies this burden if substantial evidence supports it. *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993). A vocational expert's testimony may provide a proper basis for an ALJ's determination at step five only when a claimant's impairments are adequately reflected in the hypothetical questions posed to the expert. *Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir.1991).

## ALJ'S FINDINGS

In his order of May 1, 2002, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on September 1, 2000, her amended disability onset date, and has acquired sufficient quarters of coverage to remain insured through at least December 31, 2003.

2. The claimant has engaged in substantial gainful activity through December 18, 2000.

3. The medical evidence establishes that the claimant has irritable bowel syndrome, fairly well controlled; fibromyalgia (but no firm diagnosis), pain in abdomen, and colon spasm or irritable bowel syndrome, impairments which are severe but which do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's statements concerning her impairments and their impact on the ability to work are credible only to the extent they indicate the inability to engage in activity exceeding the residual functional capacity set forth below.

5. The claimant retains the residual functional capacity to perform sedentary work, or work which requires lifting and/or carrying 10 pounds occasionally and 5 pounds frequently, sitting 6 hours in an 8–hour workday, and standing and/or walking 2 hours in an 8–hour workday, with an option to alternate sitting and standing every 15 minutes. The claimant could not perform work requiring climbing, ladders/rope/scaffolds, or more than occasional stair climbing balancing, kneeling, stooping, crawling, or crouching. In addition, the claimant should avoid exposure to temperature extremes noise, hazards (machinery, heights, etc.), or dust, fumes, or other air pollutants.

6. The claimant's impairments do not prevent her from performing her past relevant work as a receptionist/bookkeeper, both as she performed it, and as generally performed in the national economy.

7. If the claimant were not able to perform her past relevant work, she would nevertheless be found not disabled by a framework of Medical Vocational Rule 201.20.

8. The claimant is a younger individual with at least a high school education and a semi-skilled work experience. She has acquired work skills which may be transferred to other jobs within her residual functional capacity.

9. The claimant is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy.

10. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this

decision (20 CFR 404.1520(e) and 416.920(e)).

(Tr. 35–36).

## SUMMARY OF ARGUMENTS

The plaintiff argues that the ALJ's credibility determination on the plaintiff's complaints of disabling pain is contrary to the legal standard set out in *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987). The plaintiff challenges the lack of substantial evidence to support the same credibility determination. The plaintiff further contends the ALJ did not properly analyze her fibromyalgia in questioning the diagnosis as "not firm" and the severity of her symptoms as unsupported by objective evidence. Finally, the plaintiff takes issue with the ALJ's decision to give more weight to the opinions of consulting physicians who did not examine the plaintiff than the plaintiff's own treating physicians. The plaintiff asks the court to reverse for an immediate award of benefits or, in the alternative, a remand for the ALJ to consider all the evidence of record.

## DISCUSSION AND ANALYSIS

### Overview of Significant Events in Medical History

On June 11, 2000, Mrs. Priest went to the emergency room complaining of abdominal pain on the right side accompanied by nausea and vomiting. She was observed to be in obvious discomfort with rebound tenderness in the right lower quadrant. She was prescribed a pain killer that provided some relief until she could be seen by her regular physician the next day.

Dr. McNeely examined Mrs. Priest on June 12, 2000, for "persistent right-sided pain" which "has been there for a month and a half." (Tr. 177). He observed that the patient was "somewhat distressed" and tenderness with palpation in the affected area. He ordered a CT scan on June 15, 2000, which was negative other than a mild diffuse enlargement of the pancreatic head. On June 19, 2000, Mrs. Priest returned with continuing complaints of abdominal pain, nausea, and vomiting. Though finding nothing noteworthy on the CT scan or ultrasound, Dr. McNeely still changed one of her prescriptions, directed her to stay off work that day, and referred her to a gastroenterologist.

Dr. Donald Waltemath, a gastroenterologist, examined Mrs. Priest and wrote his impression for the "right lower quadrant pain increasing in severity etiology undetermined" including four possible considerations and concluded that "[t]his is a tough problem and may in fact be surgical but I do think we need to assess all possibilities before moving in that direction." (Tr. 203–04). After performing a colonoscopy on July 19, 2000, Dr. Waltemath reported:

> The mechanism of her discomfort certainly remains an enigma. She had normal CAT scan. The barium enema showed spasm and irritability in the cecum, ascending colon area and similarly when they did the small bowel series spasm and irritability was noted in this area with tenderness in this area.... I would suggest we wait for the biopsies and use a trial of Librax to see if this will calm the pain down, perhaps it is motor and in fact probably from the colon and proceed from there.

(Tr. 205).

On August 3, 2000, Mrs. Priest returned to Dr. McNeely still complaining of abdominal pain with bloating and nausea. The pain was described as constant but tolerable with Ibuprofen and worse with movement. The doctor found tenderness in the affected areas, prescribed darvocet for the pain, and referred Mrs. Priest for a surgery consultation to consider a possible adhesional component to her pain.

On August 22, 2000, Dr. Judith Degraff, a surgeon examined Mrs. Priest for the

abdominal pains. The surgeon observed that the patient was "somewhat uncomfortable" with tenderness in the right lower quadrant. The surgeon discussed that her symptoms were atypical for gallbladder disease, that there are risks associated with a laparoscopic cholecystectomy, but that if her condition was interfering enough with her lifestyle then surgery was an option without any guarantees. Mrs. Priest elected the surgery which was performed on August 29, 2000, without complications.

On September 19, 2000, Mrs. Priest returned to her physician, Dr. McNeely, saying she didn't feel much better and the right abdominal pain was persisting with vomiting every second day and increased food intolerances. Dr. McNeely writes as his impression, "terminal ileitis inflammation with some irritable bowel." He prescribed some additional medications and asked her to return in two weeks. On September 28, 2000, Mrs. Priest was seen again for complaints of ongoing pain. She told the physician that her pain is "worse when she works" and that she is going to change jobs. (Tr. 197).

In October, Mrs. Priest requested Dr. McNeely to have her prescription for Darvocet refilled. On October 31, 2000, Dr. McNeely writes that Mrs. Priest will stay off work until December 4, 2000, because of her stomach. Dr. McNeely's notes for December 20, 2000, reflect:

> Freda comes in for stomach pain. We also have to fill out a form for her work. Her stomach pain is somewhat better on the Prilosec, but still there, especially with anxiety and she's under a lot of pressure at work. She's on light duty. The right lower quadrant pain seems to stay away as long as she's on light duty, less than ten pounds and no repetitive movements. They are in assisted housing. She's on her Librex and levsin for her bowels. Seems to be handling

things fairly well except when she gets stressed.

(Tr. 194). Dr. McNeely also prescribed Paxil to help with the plaintiff's anxiety.

In March of 2001, the Mrs. Priest was able to get her prescriptions refilled through the indigent care clinic run by the Lincoln–Lancaster County Health Department. The physicians confirmed the symptoms requiring the medications and observed edema in the plaintiff's legs.

The next medical records show Mrs. Priest was treated by Dr. Herrington of the Salina Cares Clinic in Salina, Kansas, on May 10, 2001. In the patient's history, it is explained that the plaintiff and her husband moved to Salina, so that her brother-in-law could help in caring for her husband who was experiencing recurrent seizures after his stroke. After a brief physical examination, Dr. Herrington wrote an assessment of irritable bowel syndrom, histal hernia, hypertension, and allergic rhinitis, and ordered her prescriptions to be refilled.

On June 13, 2001, Mrs. Priest went to the hospital emergency room complaining of chronic abdominal pain. She was given a narcotic for the pain and referred to Smoky Hill Family Practice. The plaintiff returned to the emergency room on June 21, 2001, with complaints of constant and severe abdominal pain, vomiting and diarrhea.

On July 11, 2001, Mrs. Priest was seen as a new patient at the Smokey Hill Family Practice by Dr. Kraft. Her chief complaint was right-sided abdominal pain. Dr. Kraft observed in his examination of the plaintiff that it was largely negative other than the right abdominal pain with occasional nausea and vomiting. Dr. Kraft referred Mrs. Priest to Dr. Ellis asking for a consultation on the tentative diagnosis of irritable bowel syndrome, the need for any additional evaluations, and the use of other

prescription medicines with fewer side effects. In his referral, Dr. Kraft noted that the plaintiff said the Levsin significantly improved the pain "but in doses that 'knock her out.' " (Tr. 300).

On August 7, 2001, Dr. Ellis examined Mrs. Priest and recounted her description of the abdominal pain, as follows:

> The pain first started out 18 months ago. It started near the time her husband had suffered a stroke. She was under a lot of stress and doing a lot of physical activity at that point, helping him and also working as a nurse assistant. The pain was centered in the right lower quadrant. It was sharp. At first it would come and go and seemed to be clearly exacerbated with lifting or stress. Now it is more constant. It tends to be worse with walking or riding in the car. It does not wake her from sleep but keeps her up at night and prevents her from lying on her stomach....
>
> She has intermittent diarrhea. Perhaps as the diarrhea is occurring the pain is a bit more intense but she describes a different type of stomach cramps associated with the diarrhea. The pain mainly is inside her right hipbone and this area can be very sensitive to even light touch. In general her muscles and joints seem to be very sore, tender and sensitive to touch. The pain does seem to radiate through to her back.

(Tr. 284). Dr. Ellis observed that the plaintiff was "tender to palpation over several fibromyalgia trigger points." (Tr. 285). In his plan, Dr. Ellis instructed Mrs. Priest to stop using the Librax as it was making her sleepy and use the Levsin when needed. Dr. Ellis also reported there were indications that the plaintiff's pain "may not all be GI in origin" in that "the pain increases with walking, lifting, sensitivity to touch and diffuse trigger points have made me wonder about neuro-

muscular problems or fibromyalgia." (Tr. 285). Dr. Ellis expressed his opinion that there would be some benefit in having Mrs. Priest evaluated for fibromyalgia and having an appropriate plan for treatment developed.

On August 17, 2001, Dr. Kraft examined the plaintiff and discussed the findings and recommendation of Dr. Ellis. Mrs. Priest reported fatigue, muscle aches and dizziness that had prevented her from leaving the house this past month except once for a medical appointment. Dr. Kraft observed continuing abdominal tenderness to palpation and "multiple trigger points" most of which were bilateral except for those in the chest and neck were more right-sided. (Tr. 294). Dr. Kraft then referred the plaintiff to Dr. Lies in Wichita, Kansas, for a diagnosis of the plaintiff's condition and appropriate therapy. In the referral, Dr. Kraft wrote:

> Patient with a many year history of muscle aches and fatigue. Also, she has abdominal pains (right-sided) along with diarrhea. GI complaints have been thoroughly examined-basically neg. colonoscopy, barium enema, exploratory lap. Fatigue and muscle aches have been debilitating as of late.

(Tr. 295).

On September 20, 2001, the plaintiff was seen by a nurse practitioner at the Salina Cares Clinic for refills for her prescription medicine. The examination showed "[f]ibromyalgia pressure points are positive 14/18 with the most noticeable discomfort in the illial/sacral regions and lateral epichondolar regions." (Tr. 225).

On September 24, 2001, Mrs. Priest traveled to Wichita where she was seen by Dr. Lies. The written records from this visit show that the plaintiff was "markedly tender at fibrositic points at all areas." (Tr. 305). Dr. Lies' immediate impression was that she "very likely" had fibromyal-

gia but that because of her severe symptoms he wanted to consider other system diseases and ordered a general health screen. After receiving the results of the laboratory work done as part of the health screening, Dr. Lies wrote Dr. Kraft on October 8, 2001, as follows:

As on her first visit, it is felt her most likely diagnosis is fibromyalgia with severe symptoms, and related to severe irritable bowel syndrome and migraine type headaches. This was discussed. Today she was started on amitriptyline . . . as she sleeps very poorly at night with a lot of pain. This dose may be increased to . . . . If this is not helpful in two to three weeks she will restart Paxil. . . . She continues on ibuprofen. She was again advised on an isotonic exercise program which she is doing to some extent, but she will try and gradually and slowly increase this, but not cause her to be more painful. She has been under some stress at home. She is applying for Social Security Disability and it would appear she is not able to work at this time.

Again, thank you for asking this nice patient to see us. Let me know if there are other questions. A follow-up appointment was made for six weeks.

(Tr. 302).

On October 11, 2001, Mrs. Priest went to the Salina Cares Clinic to follow-up on her medications and fibromyalgia. Dr. Allred found 15 of 17 pressure points for fibromyalgia with the most tender areas along the medial epicondylar areas. The physician continued the plaintiff on all current medications, added another prescription, and increased her dosage of amitriptyline at bedtime.

On December 17, 2001, Dr. Kraft completed a medical source statement concerning the plaintiff's ability to do work-related activities. (Tr. 307). Dr. Kraft opined that Mrs. Priest could lift ten pounds only

about ten percent of the time, could stand or walk at least two hours in an eight hour day, and would need to alternate periodically between sitting and standing. He also opined that the plaintiff was frequently limited in handling and fingering and explained that "musculoskeletal pain and fatigue limit manipulative functions to less than constant usage." (Tr. 309). In a letter dated December 18, 2001, Dr. Kraft wrote:

While here in Salina, the patient has been evaluated by a gastroenterologist who suggested that the pains that she is feeling are possibly not GI in origin and may be related to some musculoskeletal problem. The patient was further evaluated by a rheumatologist in Wichita who found that she is most likely suffering from fibromyalgia with severe symptoms. The patient continues to have multiple trigger points at the insertion of the muscles onto bone as well as continued symptoms of irritable bowel syndrome and migraine type headaches. This is consistent with severe fibromyalgia.

These symptoms, as corroborated by the rheumatologist, would preclude Ms. Priest from performing many activities required of employment. In particular, she should have a ten pound lifting limit and is unable to perform constant or frequently repetitive movements. Ms. Priet's condition is chronic in nature and although we are currently working on treatments to maximize the patient's functionality, Ms. Priest can reasonably be expected be afflicted by her severe fibromyalgia for at least the next twelve months.

(Tr. 311).

### Fibromyalgia

The ALJ wrote in his decision that the evidence supports that a finding that the

plaintiff has "fibromyalgia (but no firm diagnosis)." (Tr. 29). Two paragraphs later, the ALJ wrote:

> Social Security Rule 96–4p states that "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." The claimant complained of having fibromyalgia, with symptoms of migraine headaches, muscle weakness, constant vomiting, and chronic fatigue. Although Dr. Lies stated in Exhibit 14f that fibromyalgia was "very likely," there is no firm diagnosis and, in the absence of objective documentation, the undersigned finds that the diagnosis of fibromyalgia cannot be medically determined.

(Tr. 29). The plaintiff contends the ALJ erroneously concluded there was no objective documentation to support the fibromyalgia diagnosis and failed to provide any specific, legitimate reasons for rejecting the severity of her fibromyalgia. The court is persuaded that the record shows the ALJ failed to follow recognized law in evaluating medical opinions concerning fibromyalgia and further ignored uncontroverted medical evidence regarding the severity of the plaintiff's symptoms.

In a prior decision, this court summarized what other courts had said about fibromyalgia as a possible disabling condition:

> "Fibromyalgia is defined as a syndrome of pain in the fibrous tissues, muscles, tendons, ligaments, etc." *Duncan v. Apfel,* 156 F.3d 1243, 1998 WL 544353, at *2 (10th Cir.Aug.26, 1998) (Table) (citing *The Merck Manual of Diagnosis & Therapy,* at 1369 (Robert Berkow & Andrew J. Fletcher eds., 16th ed.1992)). "The symptoms of fibromyalgia are entirely subjective, and there are no laboratory tests to identify its presence or severity." *Ward v. Apfel,* 65 F.Supp.2d 1208, 1213 (D.Kan.1999) (citing *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996)). "Because fibromyalgia, ..., is diagnosed by ruling out other diseases through medical testing, ..., negative test results or the absence of an objective medical test to diagnose the condition cannot support a conclusion that claimant does not suffer from a potentially disabling condition." *Lantow v. Chater,* 98 F.3d 1349, 1996 WL 576012, at *1 (10th Cir.Oct.8, 1996) (Table). "Courts have recognized that the pain suffered by those diagnosed with fibromyalgia can be disabling." *Ward v. Apfel,* 65 F.Supp.2d at 1213 (citing *Sarchet v. Chater,* 78 F.3d at 309; *Cline v. Sullivan,* 939 F.2d 560 (8th Cir.1991); *Biri v. Apfel,* 4 F.Supp.2d 1276 (D.Kan.1998)).

*Anderson v. Apfel,* 100 F.Supp.2d 1278, 1286 (D.Kan.2000). More recently, the Eighth Circuit summarized the following observations about fibromyalgia:

> Fibromyalgia, a chronic condition recognized by the American College of Rheumatology (ACR), is inflammation of the fibrous and connective tissue, causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue. Diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests. According to the ACR's 1990 standards, fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points. Treatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and relaxants, antidepressants, and anti-inflammatories. *See* Jeffrey Larson, *Fibromyalgia, in 2 The Gale Encyclopedia of Medicine* 1326–27 (Jacqueline L. Longe et al. eds., 2d ed.2002).

*Brosnahan v. Barnhart,* 336 F.3d 671, 672 n. 1 (8th Cir.2003).

■ Considering the above quoted statements as well as the medical record here, the court concludes there is no substantial evidence to sustain the ALJ's finding "that the diagnosis of fibromyalgia cannot be medically determined." (Tr. 29). Even though the claimant complained of symptoms consistent with fibromyalgia, the ALJ based his conclusion that there was no medically determinable impairment exclusively on his interpretation of Dr. Lies' records and on the asserted lack of objective documentation. The ALJ reveals his fundamental misunderstanding of fibromyalgia in asserting that there must be objective documentation of this condition (other than the plaintiff's complaints) before there is a medically determinable impairment. As the Eighth Circuit said in *Brosnahan,* the "objective medical evidence of fibromylagia" was the "consistent trigger-point findings" and the plaintiff's "consistent complaint during her relatively frequent physicians' visits of variable and unpredictable pain, stiffness, fatigue, and ability to function." 336 F.3d at 678. The medical record in this case, as summarized above, is replete with consistent trigger-point findings and plaintiff's ongoing complaints of pain, fatigue, and inability to sleep during her frequent visits to physicians and emergency rooms.

As for the ALJ's subjective interpretation of Dr. Lies' records, neither Dr. Lies nor Dr. Kraft who referred the plaintiff to Dr. Lies treated the diagnosis of fibromyalgia as questionable, indeterminate, or unreliable. Indeed, as set forth in his letter to Dr. Kraft of October 8, 2001, Dr. Lies laid out his diagnosis, the medications prescribed, the recommended course of treatment, and scheduled a follow-up appointment for six weeks later. Nothing in Dr. Lies' records show that he questioned the severity of the plaintiff's complaints

related to fibromyalgia or that he believed additional tests needed to be conducted at that time to confirm his diagnosis. That Dr. Lies chose to describe his diagnosis of fibromyalgia in terms as "very likely" or "most likely" was not a factor considered significant to Dr. Kraft. Like Dr. Lies, Dr. Kraft observed that the plaintiff experienced symptoms consistent with fibromyalgia. (Tr. 308). Based on his reading of Dr. Lies' report and his treatment of the plaintiff, Dr. Kraft concluded that "Ms. Priest can reasonably be expected to be afflicted by her severe fibromyalgia for at least the next twelve months." (Tr. 311). This appears to be an instance where the ALJ has erroneously substituted his own judgment about a diagnosis for that of the treating physicians. Finally, the use of such terms as "very likely" and "most likely" to describe a diagnosis of fibromyalgia appears consistent with a conscientious medical effort to evaluate a condition for which the diagnosis is made by eliminating other possible medical conditions and for which there are no confirming diagnostic tests. The court believes the case needs to be remanded for the ALJ to consider the entire medical record in light of the legal standards that have been applied to fibromyalgia

### Credibility Findings on Plaintiff's Complaints

Because "[c]redibility determinations are peculiarly the province of the finder of fact," a reviewing court will not upset them "when supported by substantial evidence." *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995). Credibility determinations, however, cannot be based on intangible or intuitive reasons, but "must be grounded in the evidence and articulated in the determination or decision." Soc. Sec. Rul. 96–7p, 1996 WL 374186, at *4. Credibility findings "should be closely and affirmatively linked to substantial evidence and not

just a conclusion in the guise of findings." *Kepler,* 68 F.3d at 391.

■ The court finds that the ALJ's credibility findings concerning the plaintiff's testimony and complaints are based on isolated readings of excerpted materials, are seriously contradicted by other significant and compelling medical evidence, and, thus, are not supported by the substantiality of the evidence. For every reference that the plaintiff told a physician that her abdominal pain and related symptoms appeared better, there are at least several more references in the same record of continuing and serious abdominal pain and related symptoms found in physician reports and emergency room records. Examined for the abdominal pain and, in some instances treated, by two gastroenterologists, a surgeon, a rheumatologist, and several general physicians, and subjected to numerous diagnostic procedures including a colonoscopy. cholecystectomy, CAT scan, ultrasound and barium enema, the plaintiff still had days when the abdominal pain was so severe that she went to a physician or the emergency room or took a prescription medicine that "knocked her out." Because of the "extensive GI evaluation with no true pathology being found" for the severe symptoms, a gastroenterologist was the first to suggest that her abdominal pain may not be "GI in origin" but rather "neuromuscular problems or fibromyalgia." (Tr. 285). What is most noteworthy from all of these medical records is that not a single physician ever suggested the plaintiff was exaggerating her pain or was not credible. Instead, each physician attempted to diagnose the physical cause of the pain including several referrals to specialists and treated the plaintiff for the pain with various medications. A reading of the entire record affords no substantial evidence to sustain the ALJ's finding that "[t]he objective medical evidence does not does not support the alleged worsening of the claimant's medical condition." (Tr. 31).

The court does not find substantial evidence in the record showing the plaintiff's daily activity level was inconsistent with her claimed disability. The ALJ chose to read the plaintiff's written report of daily living activities without consideration of the medical records, the third-party statements, and the plaintiff's testimony that her level of activity depended on the level of pain she was experiencing that day and that her efforts to engage in such activities were always quite guarded and brief. A claimant "need not prove that her pain precludes all productive activity and confines her to life in front of the television." *Baumgarten v. Chater,* 75 F.3d 366, 369 (8th Cir.1996) (citation omitted). Evidence that a claimant engages in limited activities may be considered, along with other relevant evidence, in considering entitlement to benefits. *Gay v. Sullivan,* 986 F.2d 1336, 1339 (10th Cir.1993). Trying to stay active through limited activities on those days when the pain is not as great is not substantial evidence of a daily activity level consistent with the ALJ's RFC finding. " 'Occasional symptom-free periods—and even the sporadic ability to work are not inconsistent with disability.' " *Reddick v. Chater,* 157 F.3d 715, 724 (9th Cir.1998) (quoting *Lester v. Chater,* 81 F.3d 821, 833 (9th Cir.1995)).

Once again, the ALJ takes a single report filled out by the plaintiff and concludes that the plaintiff experiences no side effects from her medications. (Tr. 135). This report stands in stark contrast to the plaintiff's testimony where she mentioned three medicines by name that caused drowsiness and interfered with concentration. None of those three medicines appear on the plaintiff's prior written report. Moreover, the medical record shows

the plaintiff reported side effects to her physicians.

This court in *Anderson v. Apfel* relied on Tenth Circuit authority in concluding that the ALJ had not properly analyzed the plaintiff's pain complaints in light of her diagnosis of fibromyalgia:

> However, "[t]he pain [of fibromyalgia] is aggravated by strain or overuse," *The Merck Manual of Diagnosis & Therapy*, at 1370, and is accompanied by symptoms such as poor sleep and fatigue, see *id.* Plaintiff's problems with sleep disturbances and fatigue are documented. (citation omitted). Therefore, it is not apparent what evidence supports the ALJ's finding that she need not lie down periodically during the day.

*Duncan v. Apfel*, 156 F.3d 1243, 1998 WL 544353, at *2 (10th Cir.Aug.26, 1998). Likewise, the record here establishes that Mr. Anderson suffers from poor sleep and fatigue, and the record contains no evidence to support the ALJ's finding that Mr. Anderson need not lie down three to four times a day. "Given the nature of fibromyalgia and fatigue, [Mr. Anderson's] symptoms, and the medical evidence that supports those findings to the extent possible, the ALJ committed error when he discredited [Mr. Anderson's] pain testimony for lack of objective medical evidence." *See Baca v. Apfel*, 2000 WL 357268, at *1 (9th Cir.Apr.6, 2000).

100 F.Supp.2d at 1290. The court finds that the record supports applying the same analysis and conclusion here. The court remands the case for the ALJ to consider all of the *Luna* factors for evaluating pain testimony in light of the diagnosis of fibromyalgia and the entire record.

### Treating Physician's Opinion

"In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir.2003).

An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other substantial evidence in the record." *Id.* (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.*

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§§ ] 404.1527 and 416.927." *Id.* (quotation omitted). The Tenth Circuit identified those factors as including:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir.2001) (quotation omitted). And, "[a]fter considering the pertinent factors, the ALJ must give good reasons in [the] ... decision for the weight he ultimately assigns the opinion." *Watkins*, 350 F.3d at 1301 (quotation omitted). Further, "if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Id.* (quotation omitted); *see also Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir.1994). The ALJ "may reject a treating physician's opinion outright only on the basis of contradictory

medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion."* *McGoffin v. Barnhart,* 288 F.3d 1248, 1252 (10th Cir.2002) (quotation omitted) (emphasis in original).

 The ALJ's credibility analysis of Dr. Kraft's opinion is not sustained by specific and legitimate reasons fully supported by substantial evidence. First, the ALJ characterized Dr. Kraft's opinion that "Ms Priest can reasonably be expected to be afflicted by her severe fibromyalgia for at least the next twelve months" as an opinion that the claimant was "disabled" and thus not entitled to controlling weight. The court finds the ALJ's characterization to be in error, as Dr. Kraft's opinion is confined to a medical diagnosis of a condition, to what activities are precluded by this condition, and to the expected duration of the condition, and it does not purport to be an opinion offered on the ultimate determination of whether the plaintiff is "disabled" under the Act. Concerning the ALJ's conclusion that Dr. Kraft's opinion is not supported by objective medical evidence and is not consistent with his treatment records or those of other physicians, in particular Dr. Lies, the court has already discussed the objective medical evidence above that supports the diagnosis of fibromyalgia. The ALJ does not specify what matters found in Dr. Kraft's treatment records are inconsistent with his opinion. The ALJ does contrast Dr. Kraft's opinion about manipulation limitations and strength limitations with the absence of such findings in Dr. Lies' report. That Dr. Lies did not take the time to address these limitations in his report is of questionable significance considering that Dr. Lies advised the plaintiff to let her pain determine the level of exercise and further opined that "it would appear she is not able to work at this time." (Tr. 302). The ALJ's credibility finding on Dr. Kraft is not supported by substantial evidence.

**CONCLUSION**

The ALJ's lack of apparent understanding about the diagnostic process used for fibromyalgia, the ALJ's selective analysis of isolated medical evidence, and the ALJ's failure to articulate specific and sound reasons for the different credibility judgments, compel this court to conclude that the ALJ's decision is not supported by substantial evidence.

IT IS THEREFORE ORDERED that the judgment of the Commissioner is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings not inconsistent with this memorandum and order.